### SELLERS et al. v. JOHNSON et al.
### Civ. No. 746.

District Court, S. D. Iowa, C. D.
Dec. 30, 1946.

Hayden Covington, of Brooklyn, N. Y., for plaintiffs.

W. B. Sloan and Herschel G. Langdon (of Herrick, Sloan & Langdon), of Des Moines, Iowa, and J. O. Watson, Jr., of Indianola, Iowa, for defendants.

DEWEY, District Judge.

This action was brought by plaintiffs for themselves and other members of the Jehovah's Witnesses to restrain certain individuals in the Town of Lacona and Warren County, Iowa, from an interference with their constitutional rights of freedom of speech and assembly. The action came on for hearing in open court at Des Moines, Iowa, on the 25th to 28th days of November, 1946, upon its merits and was submitted to the court for decision.

### The Facts

The facts are not greatly in dispute but the parties have deduced therefrom widely different inferences.

Plaintiffs seek an injunction to restrain the defendants from interference with plaintiffs' exercise of their rights of freedom of speech and worship in the public park of the town of Lacona, Iowa. In addition thereto plaintiffs request the court to declare that the acts and conduct of the defendants are in violation of law, and that the regulations, ordinances and statutes under color of which the defendants have admitted that they acted are unconstitutional and contrary to the Civil Rights Act.

The matters out of which the controversy arose first started when the council of Jehovah's Witnesses of the Des Moines area decided to hold a series of four meetings on each Sunday from Sept. 1 to Sept. 22, 1946, inclusive, in the public park at Lacona, Iowa. None of the Witnesses live in Lacona. Some of the representatives of the Witnesses called on two of the town council of Lacona on August 31, 1946, and asked for leave to use the park for these purposes. These councilmen thought there would not be any opposition and one of the councilmen said there was no reason to see other members of the council as there would be no trouble about their using the park. On this same date some of the Witnesses called at homes in Lacona, partly to advertise the intended meetings and partly to offer for sale their tracts or books and to talk religion. They also advertised the meetings by placards placed in the windows of business houses.

The next day, Sunday, September 1, several carloads of the Witnesses appeared at Lacona and held a service in the public park in the afternoon. Beginning on the day before this meeting there was in the town a spirit of opposition to the plaintiffs. The opposition was not based on what the Witnesses might say or against any individual, but upon the fact that certain citizens of the town and surrounding country disliked the organization on account of its attitude in opposing the draft and refusing to take any part in the 2nd World War. The meeting on Sept. 1, in the park was completed without organized opposition, although there was some interference with the speaker.

What opposition there was, however, to the meeting was reflected by the action of the town council which held a meeting on the night of Sept. 2, and passed a motion declaring that the town park or public square could not be used for any meeting or congregation of any kind unless it be brought up before the town council and voted on.

On Sunday, September 8, 1946, about noon, two cars filled with Jehovah's Wit-

nesses called on the mayor to talk about the incident of the opposition to them on Sept. 1, and learn what could be expected at their meeting of that afternoon. The mayor says that they did not ask for protection and the mayor informed them that there was opposition against them in the town and that they were coming into the community too soon after the War; that they should wait until the feeling engendered by the War should subside before holding protracted meetings in the park. Aside from argument he took no action to prevent their meeting that afternoon.

As the day progressed it was evident that there was a tense feeling and an atmosphere which indicated there was going to be trouble in the park that afternoon. The bandstand was filled with parties who expressed their displeasure at the actions of the Witnesses in trying to hold a meeting in the park, and a couple of citizens came to the bandstand with an American flag.

Notwithstanding this known feeling the Witnesses selected another part of the park for their services and started to set up a loud speaker to carry the sermon of the day. This action on the part of the Witnesses started a discussion with certain members of the opposition group which finally resulted in blows being struck and Jehovah's Witnesses spread out to protect the loud speaker and the other members of their group. Some of the Jehovah's Witnesses had brought cameras and pictures were taken of what followed. Several fights took place. The Mayor when he arrived later said that he saw bloody noses, scratched and bleeding faces. At least two Witnesses were knocked down, but it seemed from their testimony that they not only protected themselves but gave out more punishment than they received.

When the trouble started some members of the Witnesses by pre-arrangement called the sheriff who lived at Indianola. The Mayor had gone to a family reunion and he and the sheriff arrived in the park shortly after the fights had taken place. The sheriff with the Mayor talked to some of the leaders of the Witnesses and told them they ought to call off the meeting and, as it was then getting late, the Witnesses agreed not to try to hold any further

meeting that day and by an agreement were to see the sheriff and talk things over at his office in Indianola during the week.

The Mayor says that he never objected to the use of the park by the Witnesses. On Sept. 10, the town council resolved on a motion that, as the town council had prescribed rules for the use of the public park in Lacona, the Jehovah's Witnesses would have to have permission from the council before holding meetings in the park, or their action would be deemed an unlawful act and be punished as such.

On Sept. 11 the Mayor addressed a notice to C. E. Sellers and the Jehovah's Witnesses, stating that the town council had prescribed rules for the use of the public park at Lacona by groups holding meetings and that they had not obtained permission to use the park. Further, that any attempt to hold a meeting in the park without permission of the council would be deemed an unlawful act and punishable as such.

It was indicated, although not directly shown, that some time between the 8th and the 14th of September, certain prosecutions of the citizens of Lacona were being held in Indianola growing out of the affair of the 8th.

Certain members of the Jehovah's Witnesses called on the sheriff at his office on Sept. 11, and said that they wanted to hold the four meetings and asked that the sheriff protect them. The sheriff told them that he doubted whether he could protect them and asked them not to insist upon their holding meetings in the public park and suggested that if they would hold them at some private place he could handle the crowds better and protect them, but he was concerned about being able to maintain law and order if they persisted in holding their meetings. And on this and at other times he called their attention to the resolution of the town council of Sept. 10, requiring permission to be granted before using the public park and asked them not to try to hold any further meetings in the park and later told them that they could not and would not be permitted to use the park for further meetings.

During this week between Sept. 8, and the 15, the county attorney was consulted

both by the Witnesses and by the sheriff and mayor, and on Sept. 13, the town attorney, the county attorney, the sheriff and the mayor called at the office of the Attorney General of the State of Iowa and were advised not to permit further meetings of Jehovah's Witnesses and a plan to blockade all of the roads to prevent a meeting by the Witnesses on Sunday, Sept. 15, was approved by all parties. The commissioner of public safety agreed to furnish help on such a blockade. The sheriff told some of the Jehovah's Witnesses who had followed them to the State House they had better not come back to Lacona, that they couldn't hold any meetings there on the 15.

On Sept. 14, the Jehovah's Witnesses handed the sheriff a letter. This letter, after reciting what had transpired previously, notified the mayor that Jehovah's Witnesses would continue with their planned public meeting at Lacona on Sept. 15, and thereafter until the scheduled series was completed, and that the mayor and sheriff were further informed by the letter that if adequate police protection was not provided to assure Jehovah's Witnesses and others against injury and damage, civil actions would be instituted for damages.

In the meantime and between Sept. 8, and the 14, information had been coming to the sheriff that if the Jehovah's Witnesses attempted to hold a meeting at the public park at Lacona on Sept. 15, there would be trouble and bloodshed, as the meeting was going to be prevented by hundreds of "G. I's", if there was an attempt to hold a meeting. He was informed that 1,500 were coming from Ottumwa and the sheriff at Chariton, (the county seat in an adjoining county) called the sheriff by telephone and advised that he could not handle the "G.I's" from Chariton alone if the meeting were permitted. From this and other information coming to the sheriff from reliable sources he was convinced that if further meetings were held in Lacona there would be riots and bloodshed. He, therefore, decided to carry out a plan to blockade all of the roads and not permit any one in or out of the town on September 15.

On Saturday night, Sept. 14, the commercial club of the Town of Lacona had a meeting and discussed the trouble that was being caused by the Jehovah Witnesses holding a meeting in the town park. At that meeting, which was attended by a great number of citizens of the town, the sheriff announced that there would be no meetings of any kind in Lacona the next day. There would be no church, no ball game, and that the roads would be blockaded and no one permitted to enter or leave the town except in emergency cases during the next day. He deputized some 100 citizens of the county to assist him in preventing, as he says, "riots and violence" on the following day and to assist him in the blockade.

The next day, Sept. 15, the public roads in and around the town of Lacona were blockaded and no one, except in emergency cases, was permitted to enter or leave the town. In the afternoon several carloads of Jehovah's Witnesses arrived at one of the blockades and were informed by the sheriff that they could not enter the town and hold a meeting on that date and after some conversation they returned to Des Moines. Besides the sheriff of Warren County and his deputy, the sheriff of Marion County and one deputy was present, as was the sheriff of Lucas County with one deputy, and some 8 or 10 members of the State Highway Patrol. No further attempt was made by the Jehovah's Witnesses to hold their meeting at Lacona except that on Sept. 25, a letter was addressed to the Mayor and council stating that it was necessary to continue these Bible lectures as originally scheduled and asked for permission to use the park on Sunday, Sept. 29, 1946, at 2:00 o'clock in the afternoon. The letter also advised the Mayor and council that the Witnesses were going ahead with their plans to use the park, with or without permission.

At a city council meeting held on Friday, Sept. 27, the minutes of the meeting recite that this letter was received and it was voted not to give permission to use the park and that there was no use to notify the Witnesses of their decision because they had stated in their letter that they

were coming whether the council gave them permission or not. No attempt to hold a meeting was had on September 29, or since.

■■ The court has jurisdiction to entertain the action. The rights of free speech and assembly under the First Amendment are privileges of citizens of the United States guaranteed against State infringement by the 14th Amendment. The rights to due process of law and equal protection of the laws are guaranteed not only to citizens but to any person. The remedy for a deprivation of these rights is provided by the Civil Rights Act,—Sec. 43, Title 8 U.S.C.A.; jurisdiction over the enforcement of which is given to the District Courts of the United States by Section 24(14) of the Judicial Code, Title 28, U.S.C.A. § 41(14). Snowden v. Hughes, 321 U.S. 1, 64 S.Ct. 397, 88 L.Ed. 497; Hague v. C.I.O., 3 Cir., 101 F.2d 774, 790; Douglas v. City of Jeannette, 319 U.S. 157, 63 S.Ct. 877, 87 L.Ed. 1324.

Defendants claim that any action on their part which might have interfered with the constitutional rights of the plaintiffs resulted from an attempt on their part to protect the peace and enforce the criminal laws of the State of Iowa.

■ The general policy of the federal courts against interfering with a state's enforcement of its own laws is well recognized. American Fed. of Labor v. Watson, 327 U.S. 582, 66 S.Ct. 761; Chicago v. Fieldcrest Dairies, 316 U.S. 168, 62 S.Ct. 986, 86 L.Ed. 1355; Watson v. Buck, 313 U.S. 387, 61 S.Ct. 962, 85 L.Ed. 1416; Beal v. Missouri Pac. R. Corp., 312 U.S. 45, 61 S.Ct. 418, 85 L.Ed. 577; DiGiovanni v. Camden Fire Ins. Ass'n., 296 U.S. 64, 56 S.Ct. 1, 80 L.Ed. 47; Spielman Motor Co. v. Dodge, 295 U.S. 89, 55 S.Ct. 678, 79 L.Ed. 1322. And especially are they reluctant to interfere with the enforcement of criminal laws. American Fed. of Labor v. Watson; Douglas v. City of Jeannette, both supra; Spence v. Cole, 4 Cir., 137 F.2d 71; Whisler v. City of West Plains, 8 Cir., 137 F.2d 938. Even in cases where there is a prosecution under an invalid ordinance. Douglas v. Jeannette, supra.

Hence, as stated in Douglas v. Jeannette (319 U.S. 157, 163, 63 S.Ct. 877, 881, 87 L.Ed. 1324):

■■ "Courts of equity in the exercise of their discretionary powers should conform to this policy by refusing to interfere with or embarrass threatened proceedings in state courts save in those exceptional cases which call for the interposition of a court of equity to prevent irreparable injury which is clear and imminent; and equitable remedies infringing this independence of the states—though they might otherwise be given—should be withheld if sought on slight or inconsequential grounds. DiGiovanni v. Camden Ins. Ass'n., supra., 296 U.S. 64, 73, 56 S.Ct. 1, 81 L.Ed. 47; Matthews v. Rodgers, 284 U.S. 521, 525, 526, 52 S.Ct. 217, 219, 220, 76 L.Ed. 447; cf. United States ex rel. Kennedy v. Tyler, 269 U.S. 13, 46 S.Ct. 1, 70 L.Ed. 138; Massachusetts State Orange v. Benton, 272 U.S. 524, 525, 47 S.Ct. 189, 71 L.Ed. 387."

Federal courts will intervene, however, where there is great and immediate danger of irreparable injury. Hague v. C.I.O., 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423; Douglas v. Jeannette; DiGiovanni v. Camden Fire Ins. Ass'n.; Spielman Motor Co. v. Dodge; Beal v. Missouri Pac. R.; all supra; Mayo v. Canning Co., 309 U.S. 310, 60 S.Ct. 517, 84 L.Ed. 774.

The defendants are Lewis Johnson, Lo Goode, Paul MacFarland and the Town of Lacona, Iowa. The complaint recites that the individual defendants are the sheriff of Warren County, the Mayor and Town Marshal, of Lacona, respectively, and that they are sued as individuals and in their official capacity. They are named as individuals in the caption of the complaint.

The prayer of the complaint asks the court to issue an injunction against the defendants from enforcing the resolution of the Town Council of Sept. 10, 1946, and from barring the plaintiffs from Lacona, on account of their preaching activities in the public park and from denying the plaintiffs the use of the park for meetings and assembly. Plaintiffs also pray for a declaratory judgment as to their rights in the premises.

784

■ If it were necessary to determine the question, there can be little doubt that the resolution referred to is unconstitutional. Hannibal & St. J. R. Co. v. Husen, 95 U.S. 465, 472, 24 L.Ed. 527; Lovell v. City, 303 U.S. 444, 58 S.Ct. 666, 82 L.Ed. 949; Schneider v. State, 308 U.S. 147, 60 S.Ct. 146, 84 L.Ed. 155; Cantwell v. Connecticut 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213, 128 A.L.R. 1352; Jones v. Opelika, 316 U.S. 584, 596, 62 S.Ct. 1231, 86 L.Ed. 1691, 141 A.L.R. 514; Jamison v. Texas, 318 U.S. 413, 63 S.Ct. 669, 87 L.Ed. 869; Hague v. C.I.O., 3 Cir., 101 F.2d 774, 783. However, I doubt the propriety of this court taking any action with reference to the resolution. It is true it was passed in an effort to prevent the use of the park by the plaintiffs, but it does not carry any penalty and there is no way of enforcing the resolution. Neither the Mayor nor the Sheriff, nor the Town Marshal, tried to enforce this resolution. The Witnesses knew that the resolution was without any force or effect as they paid no attention to it as shown by the letter of the council dated Sept. 27, 1946.

■ It is apparent that this resolution and the actions of the council of the town of Lacona were slight and inconsequential and are not, under the facts shown, required to be enjoined by a federal court to prevent irreparable injury which is clear and imminent.

■ However, this doctrine of the refusal of the federal courts to interfere with the actions of a state does not apply to the question of whether or not the defendant sheriff had the right and authority to refuse permission of the plaintiffs to hold their meetings in Lacona on the afternoon of September 15th. In Douglas v. Jeannette, 319 U.S. 157, at page 164, 63 S.Ct. 881, 882, 87 L.Ed. 1324, 146 A.L.R. 81, on this question, it is said: "In these respects the case differs from Hague v. C.I.O., supra, 307 U.S. at pages 501, 502, 59 S.Ct. at pages 957, 958, 83 L.Ed. 1423, where local officials forcibly broke up meetings of the complainants and in many instances forcibly deported them from the state without trial."

We therefore must decide the question on its merits of whether the sheriff under the situation then existing had the right to bar the plaintiffs from entering the town of Lacona on September 15, 1946.

Neither the town of Lacona, its Marshal, nor the Town Mayor appeared to have anything to do with barring the plaintiffs from the town on Sept. 15. The mayor is a magistrate and not a peace officer under the laws of the State of Iowa. However, there is no doubt but that as an individual he gave his approval to the activities of the sheriff in barring the Witnesses from the town on that day.

In the complaint it is alleged that the defendants illegally conspired with others to abandon the plaintiffs and to refuse to provide them any protection in the exercise of their legal rights; that the defendants conspired with others to refuse to enforce the laws of the State and to arrest the mobsters; and that all the actions of the defendants, other than the corporate defendants, were an unlawful conspiracy against the plaintiffs.

■ I listened to the evidence very carefully with reference to these questions and I was unable to find any evidence that would warrant a finding of abandonment or of any conspiracy. The mayor Mr. Lo Goode, from his appearance and conduct and demeanor on the witness stand convinced that he was a kindly disposed, agreeable gentleman with great tolerance. He treated the plaintiffs with kindness and courtesy and was kindly disposed towards them and their meetings. It is unfair to him to say that he conspired with others to prevent the Jehovah's Witnesses from holding their meetings in the park at Lacona. The same can be said as to Sheriff Johnson. While he is a man of considerable executive ability, everything indicated that he tried his best to keep down feeling between the warring factions and that he did not have any hatred or malice or ill-will towards the Jehovah's Witnesses or any member of that organization, but, on the other hand, he at all times treated them with courtesy and consideration.

However, both the sheriff and the mayor were convinced that the only way to pre-

serve the peace and harmony in the town of Lacona was to prevent the Jehovah's Witnesses from holding the meeting in the public park on Sept. 15, and the following Sunday.

The question therefore is whether or not in this determination and decision and in their actions these defendants or either of them had deprived the plaintiffs of their constitutional rights under color of enforcing the laws of the State of Iowa.

There is no doubt, as I have heretofore stated, of the constitutional rights of the plaintiffs to hold their meetings in the public park at the town of Lacona on these dates. On the other hand, there is no doubt of the right and duty of the sheriff to preserve the peace of the community. We therefore have two rights in the exercise of which there was a direct conflict and we have presented a situation of an irresistable force—the constitutional rights of the Jehovah's Witnesses—meeting an immovable body—the right and duty of the police officers to preserve the peace of the community. "Retention by the states of the police power necessary for their internal government has long been recognized." Watch Tower Bible & Tract Society v. Town of Bristol, D.C., 24 F.Supp. 57, 59, and cases therein cited; affirmed, 305 U.S. 572, 59 S.Ct. 246, 83 L.Ed. 361.

The Supreme Court of the United States has repeatedly asserted when these constitutional questions were being decided, that —"The power and the duty of the State to take adequate steps * * * to protect * * * the lives, and property of its residents cannot be doubted." Thornhill v. Alabama, 310 U.S. 88, 105, 60 S.Ct. 736, 745, 84 L.Ed. 1093; Carlson v. California, 310 U.S. 106, 60 S.Ct. 746, 84 L.Ed. 1104; Schneider v. State, 308 U.S. 147, 161, 60 S.Ct. 146, 84 L.Ed. 155; Bakery & Pastry Drivers' Local v. Wohl, 315 U.S. 769, 775, 62 S.Ct. 816, 86 L.Ed. 1178; Thomas v. Collins, 323 U.S. 516, 530, 65 S.Ct. 315, 89 L.Ed. 430.

It seems to me that under this situation the rule of "clear and present danger" applies. Schenck v. United States, 249 U.S. 47, 39 S.Ct. 247, 63 L.Ed. 470; Cantwell v. Connecticut, 310 U.S. 296, 60 S.Ct. 900, 906, 84 L.Ed. 1213, 128 A.L.R. 1352; Bridges v. California, 314 U.S. 252, 262, 62 S.Ct. 190, 86 L.Ed. 192, 159 A.L.R. 1346; Board of Education v. Barnette, 319 U.S. 624, 639, 63 S.Ct. 1178, 87 L.Ed. 1628, 147 A.L.R. 674. To warrant interference the situation must also be serious and grave. Idem.

In other words, any attempt to restrain the liberties guaranteed by the 1st Amendment to the Constitution must be justified by clear public interest, threatened, not doubtfully or remotely, serious and grave, and involve a clear and present danger. Thomas v. Collins, supra.

Attention should also be called to the discretionary powers of a sheriff. Where a public official, and especially a sheriff is acting within the scope of his authority, the exercise of such discretion will not be controlled by injunction of the courts. It would be a dangerous doctrine that would permit the courts to interfere with the discretion of a sheriff in trying to preserve the peace of his community or control his actions in carrying out his duties. Of course, he must not prevent or interfere with constitutional rights, except where the danger is clear and imminent.

I have to agree with the town attorney, the county attorney, the attorney general of the State of Iowa and the Commissioner of Public Safety of the State that the situation as presented to the sheriff on and prior to the 15th day of September, 1946, was such that his actions were legal and proper and done for the purpose of preserving the peace and preventing bloodshed in his community, and that this clear and present danger was grave and serious enough to warrant him in taking the action that he did take.

The psychology of a mob is a dangerous phenomenon. It is like a snowball that increases in size and intensity and danger as it rolls down a steep hill. It has been my observation that where feeling has become so intensely aroused as it was at Lacona on or about Sept. 15, 1946, that somebody has to be killed before people will come to their proper senses. A mob is without rhyme or reason.

From the facts presented to the sheriff on and prior to the 15th day of September,

1946, there can be no doubt of the honesty of his opinion.

It is apparent to the court that the Witnesses when they attempted to hold their meeting on Sept. 8, 1946, at Lacona, went there duly advised of the opposition that they were to meet and had prepared themselves for it. Their largest and strongest members when danger started were to take the initial line of defense. Certain members had been delegated to protect the automobiles and certain other members were to call the sheriff and other state officials, if necessary. Some of the Witnesses brought Kodaks so as to prepare for prosecutions over the expected riots. Under this situation the inference is compelling that the Witnesses not only knew that they would meet with opposition in attempting to hold these meetings, but they invited opposition.

In holding that actions of legislative bodies were proper in prohibiting freedom of speech and assembly under certain circumstances, the Supreme Court of the United States has held that the right of a state to protect its youth by restrictive child labor laws is proper, even where it prevents the youth from enjoying the right of freedom of speech; Prince v. Massachusetts, 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645; and a statutory requirement that a license must be secured from a city council to have a parade was held constitutional, even though its secondary result was a limitation on freedom of speech; Cox v. State of New Hampshire, 312 U.S. 569, 61 S.Ct. 762, 85 L.Ed. 1049, 133 A.L.R. 1396.

The cases principally relied upon by the plaintiffs in support of their contentions that the duty of the sheriff was to permit the Witnesses to have their meeting in the park and to protect them are not in point. Dearborn Publishing Co. v. Fitzgerald, D. C., 271 F. 479; Hague v. C. I. O. 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423. The first of these cases is an opinion by a district judge and only holds the well known doctrine that a person may not be enjoined for making speeches which might cause breaches of the peace. And I am unable to read into the Hague case the similarity between the situation in New Jersey and that as shown by the evidence in this case, as claimed by the plaintiffs. In the Hague

case, the officers of the city troubled the waters in order to accomplish their purposes; while in the case at bar, if any one troubled the waters it was the Witnesses and not the public officers. The Hague case showed a conspiracy to prevent a proper exercise of the right of assembly and free speech, while the present case shows not only a proper regard for these rights of the plaintiffs but also a high regard for the peace of the little community of Lacona.

Plaintiffs contend that the sheriff was without authority to bar the public roads of the State of Iowa and prevent ingress and egress to the town of Lacona. If this were the controlling question in the case at bar, this court could not decide that question as it is a question to be decided by the State court. Railroad Commission v. Pullman Co., 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971; Chicago v. Fieldcrest Dairies, 316 U.S. 168, 62 S.Ct. 936, 86 L.Ed. 1355; Spector Motor Co. v. McLaughlin, 323 U.S. 101, 65 S.Ct. 152, 89 L.Ed. 101; American Federation of Labor v. Watson, 327 U.S. 582, 66 S.Ct. 761; Green v. Phillips Petroleum Co., 8 Cir., 119 F.2d 466.

However, I agree with the attorney for the plaintiffs that the questions to be determined here are broader than the question of whether or not the sheriff had the right to blockade the public roads of the State of Iowa. It includes the question of the right of the sheriff under the prevailing situation to absolutely bar the plaintiffs from the town of Lacona on Sept. 15, 1946. The same question would be present if he had forcibly removed them from the town, and this question has to be determined by the "clear and present danger" rule above set out rather than to stop and permit the State court to examine one phase of it, to wit, whether the sheriff had the right to blockade the public roads.

This court cannot determine the rights of the parties by declaratory judgment in a case where the court must under the situation refuse equitable relief. Great Lakes v. Huffman, 319 U.S. 293, 63 S.Ct. 1070, 87 L.Ed. 1407; Watson v. Buck, 313 U.S. 387; Beal v. Missouri Pac. R. Corp., 312 U.S. 45, 61 S.Ct. 418, 85 L.Ed. 577;

Spielman Motor Co. v. Dodge, 295 U.S. 89, 95, 55 S.Ct. 678, 79 L.Ed. 1322; Whisler v. City of West Plains, 8 Cir., 137 F.2d 938.

The complaint of the plaintiffs will therefore have to be dismissed upon its merits. Plaintiffs except.

Findings of fact and conclusions of law are separately filed herewith.

### Findings of Fact

1. The town of Lacona, with a population of approximately 400 people and a public park consisting of a single square block, is situated in Warren County, Iowa.

2. Plaintiffs are members of an organization called Jehovah's Witnesses and undertook to hold a series of four open air meetings in the public park in the town of Lacona on four Sundays of September 1, 8, 15 and 22, 1946.

3. These meetings were advertised by the Witnesses by placards placed in business houses in the town of Lacona and by leaflets and word of mouth.

4. The first meeting of Sept. 1, 1946, was completed by the Witnesses in the public park and while no organized resistance was had to this meeting there was some interference with the speaker.

5. That the plaintiffs attempted to hold another meeting in the public park on Sept. 8, 1946, and this meeting was interfered with by residents of the town and surrounding countryside, resulting in a fight in which several of the Witnesses were knocked down, among them a woman who had come prepared to take photographs of the expected trouble.

6. That prior to the meeting of Sept. 8, 1946, it was very apparent that there would be opposition to the meeting to be held on that afternoon, as the atmosphere was tense with expectation of a riot and the citizens of the town generally were gathered near the park to witness what was going to take place. Despite this known feeling the Witnesses insisted upon holding a meeting but did not complete it.

7. The meeting attempted on Sept. 8, 1946, was started when the Witnesses attempted to set up a loud speaker in the park and resulted in some bloody noses and scratches and some people being knocked down. The Witnesses defended themselves and had the best of the encounter.

8. Neither the mayor nor the sheriff was present when the trouble started in the park on Sept. 8, 1946, but as soon as the trouble did start some of the Witnesses called the sheriff and he came from Indianola as soon as he could get to Lacona. The mayor and sheriff arrived after the trouble was over and it is agreed by all parties that the Witnesses did not try further to have a meeting on that day and that something would try to be worked out during the following week.

9. The Witnesses had never formally obtained the permission of the town council to hold their meetings, although they had the permission of two of the councilmen privately.

10. When it appeared at the first meeting that there would be opposition to these meetings the council passed a resolution requiring the permission to be obtained for the use of the park. This resolution was not in the form of an ordinance as it did not carry any enforcement clause. A similar resolution was passed on September 10, 1946.

11. After the difficulties attending the meeting of Sept. 8, 1946, an inflamed situation developed among the citizens of the town of Lacona and surrounding country and even in adjoining counties. So much so that the sheriff of at least one county telephoned the sheriff of Warren County advising him that a mob from his county would attend the meeting of Sept. 15, and that they could not be restrained.

12. The sheriff and mayor after the meeting of Sept. 8, tried to dissuade the Witnesses from having any further meetings as they were afraid of serious trouble which they could not handle; but the Witnesses insisted that they were going to come whether there was trouble or not.

13. The sheriff and the mayor sought advise from the county attorney of Warren County and of the Attorney General of the State of Iowa and were assured that under the circumstances they would be within their rights if they felt it necessary to blockade the town and not permit any one

788

to enter or leave the town on the date of the meeting of Sept. 15, 1946.

14. That the sheriff and the mayor both believed that this course was the best course to pursue that would prevent riots and bloodshed and the only course of conduct that would permit them to control the situation and preserve the peace of the community.

15. That neither the mayor nor the sheriff conspired with others with reference to the actions that they took in trying to keep down riots and bloodshed on the meeting of Sept. 15.

16. On Sept. 15, 1946, the threat of mob violence in Lacona was a substantive evil and a clear and present danger, substantial and grave.

### Conclusions of Law.

1st. That the Jehovah's Witnesses had a constitutional right to hold their meetings in the public park at Lacona on the dates they attempted to hold such meetings.

2nd. That they so had a right of assembly on those dates for peaceful purposes and that the purposes for which they did and intended to assemble were peaceful.

3rd. That the resolution passed by the town council attempting to prevent the use of the park by the Jehovah's Witnesses was unconstitutional and void as against the plaintiffs.

4th. That the resolution and actions of the town council were not sufficient and are too inconsequential to warrant a federal court of equity in restraining the actions of the town council.

5th. That the marshal of the town of Lacona named as a defendant did not take any action that would warrant a federal court in issuing an equitable injunction as against him.

6th. That the mayor is not a law enforcing officer and his actions and conduct complained of in these proceedings were only those of one trying to preserve the peace of the community in his official position as mayor of the town.

7th. That the actions of the sheriff were done and performed by him in a belief on his part that his actions in preventing the Witnesses from entering the town of La-

cona on Sept. 15, were the only and best ways of preventing riots and bloodshed on that date and that in doing this he was acting within the scope of his authority and properly under the situation as then existed.

8th. On Sept. 15, 1946, the threat of mob violence in Lacona was apparent and real, substantial and grave, and a clear and present danger to the peace and quiet of the town and the situation warranted the sheriff in barring the plaintiffs from the town, even though it interfered with their right of assembly and free speech.

9th. That plaintiffs' petition should be and the same is hereby dismissed upon its merits with judgment against the plaintiffs for costs.

Plaintiffs except to each and every finding of fact and conclusion of law made herein.